UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　Case No. 19-20216
　　　　　　　　　　　　　　　　　　　Honorable Victoria A. Roberts

JEROME BRAY,

    Defendant.
_____/

**<u>ORDER GRANTING DEFENDANT'S
MOTION TO SUPPRESS [ECF No. 210]</u>**

**I.　　INTRODUCTION**

The government charges Jerome Bray ("Bray") with conspiracy to possess with intent to distribute 500 grams or more of cocaine. During a traffic stop on February 15, 2017, Michigan State Police ("MSP") seized nearly $20,000 from Bray – money which the government alleges Bray was taking to co-defendant Curtis Wood ("Wood") to purchase cocaine.

Bray moves to suppress the money and statements he made during the traffic stop, arguing that law enforcement lacked reasonable suspicion to stop him and lacked probable cause to arrest him and search him and his car. The Court held an evidentiary hearing on June 8, 2021, after which each party filed a supplemental brief. While the Court finds officers had

reasonable suspicion to stop Bray, they did not have probable cause to arrest or search him.

The Court **GRANTS** Bray's motion [ECF No. 210].

## II. FACTS

This case stems from a Federal Bureau of Investigation ("FBI") and Drug Enforcement Agency ("DEA") investigation into a drug trafficking operation between 2016 and 2018. The investigation's prime target was Wood – whom law enforcement identified as a multi-kilogram cocaine distributor. Agents testified that at some point during the investigation, they identified Bray as one of Wood's customers based on surveillance and wiretapped phone calls.

FBI Special Agent Neil Gavin ("SA Gavin") testified that they had intercepted thousands of phone calls during the investigation, several of which were between Wood and Bray from January 20, 2017 to February 15, 2017. Based on investigative work and his training and experience, SA Gavin testified that he observed a pattern in Bray and Wood's phone conversations concerned drug trafficking – they often used shorthand or code. [ECF No. 345, PageID.1914, 1932-33]. SA Gavin also testified that surveillance during the investigation included observing Bray meet with Wood. [*Id.*, PageID.1933].

On the evening of February 15, 2017, agents overheard three phone calls between Bray and Wood which led them to believe Bray had scheduled a meeting with Wood to buy half a kilogram of cocaine.

In a call at 6:11 p.m., Bray asked Wood, "what type of number would I have to put together for you man to try to come halfway?" [ECF No. 231-1, PageID.1115]. Wood asked Bray what he was "workin with"; Bray said, "like 12"; and Wood replied that they could "do somethin." [*Id*.]. Bray then asked Wood if he could "do it for the one six," and Wood said "give me one-six, two fifty." [*Id*., PageID.1116]. Bray then told Wood he was "gonna need to see [him] tonight"; Wood said, "Ok"; and Bray ended the call saying, "I'll call you in a minute." [*Id*.].

SA Gavin testified that he understood this call to mean that Bray was setting up a drug transaction with Wood. His interpretation of the phone conversation was this: (1) Bray first asked how much money he would need to give Wood for a half-kilogram of cocaine; (2) Wood asked how much money Bray could bring him now; (3) Bray said, "like 12" – meaning $12,000; and (4) then Bray asked if the full price of the half kilogram would be $16,000. [ECF No. 345, PageID.1917-19].

At 7:18 p.m., Bray called Wood to check if he "want[ed] to do it tonight." Wood responded in the affirmative, and Bray said he would "call[] in a minute to let [Wood] know what's up." [ECF No. 231-1, PageID.1116].

3

During this same time frame, other agents worked to coordinate a potential stop of Bray's car with the MSP. Agents frequently use MSP troopers to assist them to conceal the federal investigation, for officer safety, and because FBI and DEA agents work in plain clothes and unmarked vehicles.

At 8:04 p.m., Bray called Wood and asked if he was "bout ready" for the deal. Wood stated, "Yup ok, now ah, so you got 12 . . . then you owe me ah . . . 78." [ECF No. 231-1, PageID.1116-17]. SA Gavin testified that he understood this response to be Wood confirming that Bray had $12,000 and saying that Bray would now owe him $7,800 – which represented the difference between the $16,250 total for the half kilogram and the $12,000 Bray was planning to bring, in addition to money Bray still owed Wood from a past deal. [ECF No. 345, PageID.1922]. Bray responded, "Yea, so, I get with you[.] **[I'm gonna] let you know in a few minutes, what it is**." [ECF No. 231-1, PageID.1116-17 (emphasis added)].

This was the last intercepted call between Bray and Wood on February 15, 2017.

Believing that Bray was going to bring drug money to Wood, DEA Special Agent Shohn Joyner ("SA Joyner") and then-FBI (now-DEA) Special Agent Stacy Zirkle ("SA Zirkle") contacted MSP from their vehicle. SA Joyner testified that he told MSP that they "thought there would be a

4

drug deal that would happen later on in the day, [so they] requested assistance for a possible vehicle stop." SA Zirkle corroborated SA Joyner's testimony, as did their report.

Bray left his residence at 8:31 p.m. At approximately 8:44 p.m., MSP troopers stopped Bray for "following too closely." Bray provided an expired insurance card, and the troopers arrested him for driving without insurance. The government does not rely upon these civil traffic infractions to justify the legality of the traffic stop and the subsequent search and arrest of Bray.

According to the MSP report, the troopers searched Bray "incident to arrest." [ECF No. 252-1, PageID.1248]. The MSP troopers found $12,000 in Bray's jacket pocket. The troopers then radioed for a canine unit to come to the scene. Once there, the canine indicated positively on the center console of Bray's car. Troopers looked there and found another $7,841.

The troopers asked Bray how he got the money; Bray said he owned a couple businesses, including a "Leo's," but he did not provide any corroborating details about the Leo's or the other businesses he purportedly owned. Bray the requested a lawyer, and the questioning stopped. Troopers seized the cash from both locations and turned it over to DEA. They took Bray to the station and fingerprinted him.

## III. DISCUSSION

Bray moves to suppress all evidence and statements obtained during the February 15, 2017 stop and search of him and the car he drove. Bray says the stop, prolonged detention, arrest, and search of him and the car were unlawful. He says that based on the vagueness of the calls, the lack of corroborating evidence showing Bray was involved in drug trafficking, and the lack of an actual plan to meet/the uncertainty heard in the last call before the stop (i.e., Bray ending the call by saying, "[I'm gonna] let you know in a few minutes, what it is."), there was neither reasonable suspicion nor probable cause to justify his stop, search, and arrest.

The government does not rely on the alleged civil traffic infractions to justify the traffic stop and subsequent search and arrest of Bray. It relies solely on the evidence from the wiretaps and drug investigation. The government says there was probable cause that contraband or other evidence of criminal activity would be found in Bray's car because law enforcement heard Bray and Wood discuss meeting for a narcotics transaction.

### A. The Traffic Stop

#### 1. Fourth Amendment Framework for Traffic Stops

The Fourth Amendment prohibits unreasonable searches and seizures. Stopping a vehicle constitutes a seizure under the Fourth

6

Amendment. *United States v. Stubblefield*, 682 F.3d 502, 505 (6th Cir. 2012). The reasonableness of a traffic stop depends on: (1) whether the stop was justified at its inception; and (2) whether the scope and duration of the stop were reasonably related to the circumstances that justified the stop initially. *Id.*

"In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). Since the government does not rely on Bray's alleged civil traffic infraction to justify the stop, search or arrest, the initial question is whether law enforcement had reasonable suspicion that Bray was engaging in criminal activity to permit a *Terry* investigative stop.

"Reasonable suspicion requires 'more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'" *Id.* (citation omitted). If an officer has reasonable suspicion, he may conduct a *Terry* investigative stop. *Id.* Reasonable suspicion must be judged from the totality of the circumstances and in consideration of all the information available to law enforcement officials at the time. *Id.* It can be based on an officer's own observations or upon the collective knowledge of other officers. *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994).

7

## 2. The DEA/FBI Had Reasonable Suspicion of Criminal Activity to Justify the Stop, and The MSP Troopers Acted on the DEA's and FBI's Collective Knowledge

Based on the facts and circumstances known on February 15, 2017, the Court finds that the DEA/FBI had reasonable suspicion to stop Bray.

While the wiretapped calls between Bray and Wood were vague and the final call between Bray and Wood lacked details of a confirmed meeting, law enforcement had more than a "hunch" that Bray and Wood were engaged in criminal activity. *See Lyons*, 687 F.3d at 763.

The investigation into Wood had been ongoing since May 2016. By February 2017, law enforcement had collected relatively strong evidence showing that Wood was a kilogram level dealer of cocaine. The investigation included physical and electronic surveillance of Wood; agents had conducted controlled drug purchases from Wood; and they had intercepted many of Wood's phone calls under multiple different wiretaps on his phone. Additionally, law enforcement had information from confidential sources that Wood was a high-level drug trafficker. Though they did not have conclusive evidence that Bray was a customer of Wood's, SA Gavin testified that he listened to thousands of calls during the investigation, and he believed Bray and Wood were discussing a drug transaction during their calls on February 15, 2017.

While the Court does not believe this rises to probable cause of criminal activity – as explained below – it finds that the facts known to the DEA/FBI on February 15, 2017 amounted to "more than a mere hunch," such that they had reasonable suspicion to conduct a *Terry* investigative stop of Bray.

Moreover, SA Joyner said that he and SA Zirkle contacted MSP troopers to request assistance for a possible vehicle stop of Bray. SA Joyner testified that he informed the troopers that they were "up on a wire" and that they thought Bray would be involved in a drug deal later in the day. The troopers agreed to assist the DEA/FBI with the stop.

The collective knowledge doctrine applies to this case. *See Lyons*, 687 F.3d at 768-69. In stopping Bray, the MSP troopers acted in objective reliance on the information received from SA Joyner. *Id.* This included the relevant information – i.e., a request from the DEA/FBI that they stop Bray because they had reason to believe he was going to engage in a drug transaction. *See id.* ("[I]t is immaterial that the troopers were unaware of all of the specific facts that supported the DEA's reasonable suspicion analysis. The troopers possessed all the information they needed to act—a request by the DEA . . . that they execute the traffic stop in the expectation that illegal narcotics would be found in the vehicle.").

The troopers acted on the DEA's and FBI's collective knowledge and executed the stop pursuant to their reasonable suspicion. The traffic stop was valid. *See Lyons*, 687 F.3d at 769.

**B.    The Arrest and Search of Bray**

**1.    Fourth Amendment Framework for Warrantless Arrests and Searches**

It is well-settled that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment. *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006) (citation omitted). However, a warrantless arrest in public is reasonable under the Fourth Amendment if there is probable cause to believe that a criminal offense has been or is being committed. *Id.*; *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) ("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause.").

Generally, the Fourth Amendment requires officers to obtain a warrant before conducting a search. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). However, the Supreme Court has long recognized an exception to the warrant requirement with respect to searches of vehicles. *Id*. Under the automobile exception – which the government relies upon to justify its search – officers may conduct a warrantless search of a vehicle if they

have probable cause to believe the vehicle contains evidence of a crime. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007).

"Probable cause is defined as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *Id*. at 647-48 (citation omitted). Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Lyons*, 687 F.3d at 764. In determining whether probable cause existed at the time of the search, the Court must consider the totality of the circumstances based on the objective facts known to the officers at the time of the search. *Smith*, 510 F.3d at 648. Like reasonable suspicion, probable cause can be established through the collective knowledge of other officers. *United States v. Perkins*, 994 F.2d 1184, 1189 (6th Cir. 1993). Moreover, "[r]easonable suspicion supporting a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the car's occupants." *Lyons*, 687 F.3d at 764.

> **2. There Was Not Probable Cause to Arrest and/or Search Bray or Search the Car**

After MSP troopers stopped Bray, they arrested him, searched him "incident to arrest," and then searched the car.

As set forth above, the government does not rely upon the civil traffic stop infractions – i.e., following too closely and driving without insurance –

as its basis for the legality of the search or arrest of Bray. Even if it did, the government fails to show that either civil infraction would justify the search or arrest. Therefore, in considering whether the troopers had probable cause to search or arrest Bray, the Court need only determine whether there was a "fair probability that contraband or evidence of a crime [would] be found in [Bray's car or on his person]" and – similarly – whether there was a fair probability that Bray had committed or was committing a criminal offense. *See Lyons*, 687 F.3d at 764; *Abdi*, 463 F.3d at 557.

The government contends that the same evidence which established reasonable suspicion to stop Bray also established probable cause to search and arrest him.

Bray says that even if the wiretapped calls provided reasonable suspicion to stop him, there was not probable cause to search and/or arrest him or search the car he was driving.

The Court agrees with Bray.

While the wiretap evidence provided reasonable suspicion for a *Terry* investigative stop, case law does not support the position that officers had reasonable grounds to believe that it was fairly probable that contraband would be found on Bray or in his car. *See Lyons*, 687 F.3d at 764; *Smith*, 510 F.3d at 647-48. Compared to other cases, there is far less evidence of criminal activity here than is required to find probable cause.

12

In *United States v. Sharp*, No. 11-20699, 2013 WL 1326204, at *6 (E.D. Mich. Apr. 1, 2013), the court found that law enforcement had probable cause to search the defendant's car based on wiretapped calls informing officers that defendant would be delivering drugs to Michigan, video surveillance of members of the drug trafficking organization loading duffel bags of drugs or money into defendant's truck bed, and information from a reliable cooperating witness that the defendant would be traveling to Michigan to make drug and cash deliveries near the date of the traffic stop.

In *United States v. Vatani*, No. 06-20240, 2007 WL 789038, at *2-3, *6 (E.D. Mich. Mar. 14, 2007), the court found officers had probable cause to search defendant's car through the collective knowledge of Canadian and American law enforcement agencies. The finding of probable cause was based on: (1) evidence that defendant's drug trafficking group was moving proceeds between the United States and Canada; (2) substantial money seizures of over $900,000 related to the group; (3) wiretapped calls between defendant and another individual, during which defendant said he was "sitting on … one point five"; that he was "coming back right now"; and that he would have "some papers" for the other individual; (4) surveillance of defendant checking out of one hotel on the day of the stop, going to another hotel for a short period, and then leaving that hotel shortly after the

intercepted call above; and (5) surveillance of defendant moving bags in and out of his car and the hotels.  *Id*.

In *Smith*, the Sixth Circuit found probable cause for a car search based on the DEA's broader investigation, which included knowledge that the car was one of many owned by a suspected drug trafficker, that the defendant frequently sold drugs from his vehicles, and that an informant had observed drugs stored in the defendant's vehicles.  510 F.3d at 649.

The evidence here is much weaker than in all of those cases.  While the DEA suspected Bray was one of Wood's customers, they had not seen Wood and Bray exchange drugs or money; there was no mention of narcotics in the intercepted calls between Bray and Wood; there were no observations of Bray engaging in any drug transactions with other individuals; there were no observations of Bray transporting money, narcotics, or bags to and from his car; there were no observations that Bray's movement in the days leading up to the stop were consistent with narcotics trafficking; and there were no observations of heavy foot traffic at Bray's home.  Moreover, contrary to *Smith*, there was no knowledge or evidence that Bray frequently sold drugs from his vehicles – or any other location – and there was not an informant who observed Bray with drugs.

Without corroborating evidence against Bray, the officers here had nothing more than "mere suspicion" – which is insufficient to establish

14

probable cause.  *See Smith*, 510 F.3d at 647-48.  As Bray says, the phone calls were vague and did not mention narcotics.  There was no evidence other than the few vague phone calls demonstrating that Bray was a drug trafficker.  Additionally, the final intercepted phone call between Bray and Wood on February 15, 2017 lacked details of a meeting.  Like the two phone calls between Bray and Wood earlier that day, the final call ended with Bray expressing a desire to meet up with Wood but without actually setting a time or location for a meeting.

The evidence the government relies on to establish probable cause to search is the same it relied on to establish reasonable suspicion.  This evidence is less than the *pre-traffic stop* evidence in *Lyons* and *United States v. Lombard*, No. 15-20008, 2016 WL 6519004, at *4 (E.D. Mich. Nov. 3, 2016), where the courts found the underlying evidence established reasonable suspicion to stop but not probable cause to search.  Like those courts, this Court finds that more evidence is required to establish probable cause.

In *Lombard*, the court found that officers, through the collective knowledge of the DEA, had reasonable suspicion to stop defendant based on facts learned through wiretaps and surveillance.  Specifically, law enforcement: (1) learned that the drug trafficking organization's method of moving and concealing drugs was by placing them inside PVC pipes in the

15

axles of semi-trucks; (2) intercepted details of an upcoming drug shipment being delivered to defendant in PVC pipes at a truck yard; (3) observed defendant's pickup truck and a semi-truck arrive at the yard on the night in question; and (4) observed items being moved from a semi-truck to the bed of defendant's pickup truck. *Id.* at *2.

The court found that the reasonable suspicion developed into probable cause to search defendant's truck during the traffic stop because the officer observed PVC pipes in the bed of defendant's truck with caps on both ends – making it appear that they contained something – and covered in what appeared to be axle grease – which the officer knew was used to mask the odor of narcotics. *Id.* at *5.

Similarly, although there was not probable cause to search at the time of the stop in *Lyons*, the Sixth Circuit found that the reasonable suspicion to stop ripened into probable cause to search based on the officers' interactions with defendant during the stop. *Id.* at 770. Particularly, the defendant was shaking and breathing excitedly; she could not answer simple questions; she provided inconsistent answers about her travel plans; and her minivan smelled strongly of an odor commonly used to mask the scent of drugs. *Id.* at 760-61, 770.

Here, law enforcement had less specific information and less evidence against Bray than the officers in *Lyons* and *Lombard*. Those

16

decisions are guiding. The Court finds that officers had reasonable suspicion to stop Bray for an investigatory *Terry* stop but not probable cause to believe he was committing a crime or had contraband on him or in the car. Thus, there was no probable cause to search or arrest Bray at the time of the stop.

Moreover – and importantly – unlike in *Lyons* and *Lombard,* nothing occurred during the traffic stop of Bray to cause the reasonable suspicion the officers did have, to develop into probable cause to search or arrest him.

Because law enforcement lacked probable cause to search or arrest Bray, the evidence they found during their searches and the statements Bray made after he was arrested are fruit of an illegal search and seizure. The Court suppresses the money seized and Bray's statements.

## IV. CONCLUSION

The Court **GRANTS** Bray's motion to suppress [ECF No. 210].

**IT IS ORDERED**.

s/ Victoria A. Roberts  
Victoria A. Roberts  
United States District Judge

Dated: July 16, 2021